CARAWAY, J.
|,Samuel Dale Turner was convicted' of second degree murder in violation of La. R.S. 14:30.1 and sentenced td life imprisonment, without the benefit of parole, probation, or suspension of sentence. Turner appeals urging two assignments of error. We affirm.

Facts

On November 30, 2012, a neighbor went to the home of' 79-year-old William McCready" and discovered McCready’s body on the living[1] room floor, the victim of an apparent homicide as evidence of a struggle and a large amount of blood were present. The neighbor called the More-house Sheriffs office. Sheriffs deputies observed that the victim had been bludgeoned, stabbed numerous times and had his throat cut. It was obvious that someone had removed something from his right pants pocket. Sheriffs deputies also found the victim’s truck missing, later learning that it had been towed early that morning after a report of it blocking an intersection.-
Upon further law enforcement investigation, an eyewitness identified Samuel Dale Turner as being near McCready’s truck at the intersection the night before. Video surveillance also placed Turner in his own vehicle the night before stopping near a storm drain for over two minutes. Sheriffs deputies found a pah- of gloves and a wallet with McCready’s information in the storm drain.
Turner was arrested and charged by bill of indictment with the second degree murder of McCready on January 17, 2013. A jury trial began on July 29, 2014 and Turner was found guilty as charged. Post-trial motions in Larrest of judgment, judgment notwithstanding the verdict and new trial were-denied >by the trial court. On .Novémbeí 13, 2014, Turner received the mandatory life sentence for his conviction. *723 He filed a motion to reconsider sentence arguing that the imposed sentence was cruel and unusual. .After that motion was denied by the trial court, this appeal ensued.

Discussion

On appeal, Turner argues that the evidence was insufficient to convict him because the state failed to exclude every reasonable hypothesis of innocence. Specifically, Turner contends that there was no eyewitness testimony or DNA evidence placing him at the victim’s home on the night of the murder or testimony that he had blood on him when seen by witnesses. Turner also argues that the imposed sentence is excessive as applied to him. ■
The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard of appellate review for a sufficiency of the evidence claim is.whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Crossley, 48,149 (La.App.2d Cir.6/26/13), 117 So.3d 585, writ denied, 13-1798 (La.2/14/14), 132 So.3d 410. This standard, now legislatively embodied in La. C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; Crossley, supra; State v. Dotie, 43,819 (La. App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords, great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
Direct evidence provides proof of the existence, of a fact, for example, a witness’ testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the state relies on, circumstantial evidence to establish the existence of an essential element of a crime, the court must , assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; Lilly, supra; State v. Robinson, 47,437 (La.App.2d Cir.11/14/12), 106 So.3d 1028, writ denied, 12-2658 (La.5/17/13), 117 So.3d 918.
|4The trier of fact is charged with weighing the credibility of this evidence and on review, the same standard as in Jackson v. Virginia is applied, giving great deference to the fact finder’s conclusions. State v. Hill, 47,568 (La.App.2d Cir.9/26/12), 106 So.3d 617. When jurors reasonably reject the hypothesis of innocence advanced by a defendant, the hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Sosa, 05-0213 (La.1/19/06), 921 So.2d 94; State v. Captville, 448 So.2d 676 (La.1984).
*724 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover, 47,811 (La. App.2d Cir.10/10/12), 106 So.3d 129, writ denied, 12-2667 (La.5/24/13), 116 So.3d 659; State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La. 11/6/09), 21 So.3d 299. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent-necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct 104, 148 L.Ed.2d 62 (2000).
To sustain a conviction for second degree murder, the state must prove that the defendant killed the victim and acted with the specific intent to kill or causé great bodily harm to the victim. La. R.S. 14:30.1.
Lin this matter, Billy Croswell, a neighbor of the victim, testified that on November 30, 2012, he went to McCready’s home to investigate why his neighbor’s lawnmower had been left outside overnight. ¡ Croswell entered McCready’s home when no one responded to loiocks on the door. He discovered McCready’s body on the floor, underneath a blanket and coffee table, with a knife .in his chest. Croswell took the coffee table and blanket off of McCready and tried to rouse him. When he got no response, Croswell called 911.
Officers responded to the scene and collected evidence. Detective Terry Wyatt identified photographs and a video of the erime scene, which were entered into evidence. ' In the photographs, Wyatt identified two parts of a walking cane that was used by McCready. He also recognized a large kitchen knife found sticking into the victim’s chest, and a metal fence post used to strike McCready, under his body: McCready’s throat had been cut and he had received stab wounds to his neck. His head had been bludgeoned according to Wyatt. ■ Blood was found on the furniture and spattered onto the blinds. Wyatt testified that the blood spatter was the result of McCready being, hit with an object. The broken window inside the house was consistent with being caused by a weapon being swung. Wyatt testified that blood smear indicated that something was removed from McCready’s right pants pocket.
Wyatt stated that McCready’s pickup truck was found at a local wrecker service. It had been towed at 5:00 a.m., after being abandoned around the corner from McCready’s residence.' What was later identified as Inblood residue was found on the threshold of the door. Both the door and steering wheel of the truck were later tested. ‘ At the intersection where the truck was found, Wyatt ‘talked to two witnesses who had almost 'hit a man as they drove home the night before at the intersection near McCready’s driveway.
Wyatt then went to a local convenience store to speak with individuals there and to review video surveillance. In the video, Wyatt saw- a blue-green van turning into the store and purchasing gas, sometime around 8:50 p.m, on the prior evening. No one else could be seen in the van. Wyatt subsequently learned that the vehicle belonged to Turner. ■ Turner left the store but stopped near a storm drain at the north end of the store parking lot for 2⅜ minutes. Wyatt removed the top of the drain and discovered in the drain a wallet containing McCready’s license and veter *725 an’s card, as well as a pair of gloves with the initials “DT.” "
One of McCready’s neighbors, Claudia Matthews, testified that she was driving home with her daughter, Demia, at approximately 9:00 p.m. on November 29, 2012, when she almost struck a man. walking in the road on her street. Demia was in the front seat of the vehicle. There were no streetlights and it was dark. Claudia Matthews testified that she did not recognize the man and was unable to identify him. Demia Matthews confirmed her mother’s testimony and identified Turner in a photographic lineup as the man walking in the road. She stated thát the man had big eyes, distinctive cheeks and a salt and pepper beard which she recognized in the lineup. Demia identified Turner in court as being the man she saw that 17night. Both Claudia and Demia testified that they observed a vehicle parked farther down the road, near the bridge.
The convenience store clerk, Jana Davis, testified that-Turner acted anxious while in the store, was pacing, and did not appear to know what he wanted to buy. Davis could not say whether Turner appeared intoxicated in any way. She described him as having “a lot of facial hair,” and identified Turner as being the individual she served that evening.
Nina Turner, defendant’s daughter and McCready’s granddaughter, testified that she and Turner went to McCready’s home on November 29, 2012, so that Turner could borrow money from McCready. When they arrived, McCready was mowing the lawn. Nina Turner testified that Turner left his unemployment card with McCready as collateral for the money he gave Turner. At the time of his arrest, Turner’s electronic employment benefits card was located in his wallet.
While Turner approached = McCready, Nina Turner remained in the van and did not speak with her grandfather. When Turner returned to the van, he stated that McCready had a wallet full of money and asked, “Do you want to go knock him in the head and take his money?” Nina Turner testified that she did not take Turner’s suggestion seriously.
Turner and Nina Turner returned to Nina’s mother’s home between 7:00 and 7:30 p.m. where she stayed until 11-11:30 p.m. and then left for the evening. Nina testified that her father used cocaine the “whole time wé was together” that day. When she left him, he was not high because he had | snot smoked for an hour and a half and she explained that “a cocaine high does not last very long.”
Brenda McCready Turner, McCready’s daughter and Nina Turner’s mother, testified that she spoke with the victim by telephone between 8:00 and' 8:30 p.m. that evening. Nina was at her home then also. Brenda Turner believed that the defendant was in her home around midnight.
Cara Neblitt, Brenda Turner’s other daughter, testified that she last spoke with McCready at approximately 8:00 p.m. on November 29, 2Q12. ’ She also. testified that, when she arrived at her mother’s home on the .evening of’ November 29, 2012, Turner was not there. He arrived at Brenda Turner’s home around 11:45 p.m. on November 29, 2012.
Cheryl Swearingen, an expert.in crime scene investigation, testified that she attended the crime scene and saw two separate pools of blood which were consistent with the victim being face down and then rolled over; Her ‘observation. of the- fence post led her to believe that the victim'had been beaten about the head. The blood spatter indicated that someone struck the victim and then drew back the weapon. Swearingen . swabbed the handle of the knife found in the victim for DNA. She *726 also did a swab of the inside of his jeans pocket because it appeared that someone went into the victim’s pocket and pulled something out. She likewise swabbed what appeared to be a transfer of blood on the driver door and steering wheel of McCready’s pickup truck. She did not test the items. . .
• . Andrew Ingram, employee of the Louisiana State Police Crime lab, was qualified as an expert in DNA analysis and analyzed the DNA from this |acase. Ingram testified that a mixture of McCready’s and Turner’s DNA was found in McCready’s right pants pocket. Ingram testified that it was unlikely, but possible, for that DNA to have been the result of Turner placing something into McCready’s pocket.
Ingram also analyzed the blood found on the truck’s door threshold and determined that the “swab, was presumptively positive for blood.” He tested the blood for DNA and found it to be “consistent with the DNA profile” of McCready. Ingram also tested the DNA found on the steering wheel, which was consistent with both McCready and' Turner’s DNA.
Dr. Frank Peretti, an expert forensic pathologist and medical examiner, examined the victim. He concluded that McCready’s cause of death was multiple sharp force and blunt force injuries. He explained that the victim had six impact sites to his head and hemorrhaging in the brain cavity which would have rendered him unconscious. While the injuries to the head were fatal, McCready also suffered fatal wounds in his neck. Dr. Peretti observed four wounds there, three cutting and one stabbing. He-stated that the two fatal neck wounds involved the left carotid artery and jugular veins. The stab wound to the chest occurred after the victim was deceased according to Dr. • Peretti. McCready also had defensive wounds which indicated that he was trying to protect himself. Dr. Peretti testified that he could determine that McCready was alive when his neck was cut, because McCready had aspirated blood.
Carolyn Maddox,' ‘Turner’s estranged girlfriend, testified that Turner informed her that he “did it,” when she visited him at the sheriffs office. | mShe also testified that Turner told her that he did not want to spend his life in jail and wanted the death pehalty. During trial, Phillip McCready, the victim’s son, testified that Turner apologized to him twice.
After the presentation of this evidence and testimony, the state rested and the defense did not put on any evidence. On August 2, 2014, the jury found Turner guilty of second degree murder.
■Viewing the evidence in a light most favorable to the prosecution, we find it sufficient-' to support Turner’s conviction for the second degree murder of McCready. Certainly, the expert testimony establishing the manner of McCready’s death was sufficient to establish the perpetrator’s specific intent to kill. The remaining evidence, if believed, was sufficient to establish Turner as that perpetrator. That evidence showed that Turner had visited McCready the day before his body was found and observed a large amount of money in his wallet. Afterwards, he suggested hitting the victim on the head to obtain the money. While there, Turner gave McCready his employment card. On the night before the victim was found, witnesses placed Turner on McCready’s street acting strangely in close proximity to the illegally parked vehicle of the victim.
Although Turner argues that there was no direct evidence linking him to the crime, the record establishes that Turner was directly connected to the victim’s clothing and vehicle - by DNA evidence. McCready’s truck contained McCready’s *727 blood and both Turner and McCready’s DNA. Items had been removed from McCready’s pockets and ■ Turner’s DNA was found Nthere. At: the time of his arrest, Turner possessed the employment card he gave to McCready on November 29.
Additionally, the surveillance video clearly showed Turner stopped at the location where McCreády’s wallet and gloves, bearing Turner’s initials, were ultimately discovered. Turner also made statements indicating his guilt and more than once expressed remorse to the victim’s son.:
From this evidence, the jury ‘could have reasonably rejected Turner’s -claim that his DNA had been transferred to McCready’s pocket from some object that Turner gave to the victim and concluded that it was Turner who removed the victim’s wallet from his pocket to retrieve his employment card and money he had seen the day before.
Moreover, the jury could have reasonably concluded that Turner transferred McCready’s blood to the door of the truck and steering wheel as he drove it from the crime scene. Admittedly, the witnesses did not see blood where he was spotted on the street, yet the testimony indicated that the street was dark and the' encounter brief.
Because this direct and circumstantial evidence was sufficient for the jury to conclude beyond a reasonable doubt, to the exclusion of every other reasonable hypothesis of innocence, that it was Turner who perpetrated the second degree murder of McCready, we find no merit to this argument.
On review, Turner argues that because the trial júdge erroneously believed that he lacked the authority to" sentence Turner to anything other than life imprisonment, without the benefit of parole, pro-batión, or suspension of sentencé, the imposed sentence ' was constitutionally | ^excessive. He argues that he was denied the opportunity to present mitigating evidence in support of a downward departure from the mandatory sentence. Turner finally asserts that this Court has nothing to review on appeal because the trial court failed to take any evidence related to sentencing and failed to determine if’the sentence constituted cruel and unusual ‘punishment, as asserted in his motion to reconsider sentence.
Ordinarily, appellate review of sentences for excessiveness is á two-step process, the first being án analysis of the trial court’s compliance with" the sentencing guidelines of La. C.Cr.P. art. 894.1. However, where there is a mandatory sentence, there is no need for the trial court to justify, under Article 894.1, a sentence it is legally required to impose. State v. Smith, 49,889 (La.App.2d Cir.5/20/15), 166 So.3d 416; State v. Burd, 40,480 (La. App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/9/06), 941 So.2d 36. Moreover, because Turner’s motion to reconsider" sentence raised only a claim that the sentence imposed was excessive and amounted to cruel and unusual punishment, he is relegated to review of his sentence on that ground "alone.[1] La. *728 C.Cr.P. art. 881.1. A sentence violates La. Const, art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379.
The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. La. R.S. 14:30.1(B). The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); Smith, supra; State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789. To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that he is exceptional, namely, that, because of unusual circumstances, the defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; Smith, supra; State v. Parker, 47,952 (La.App.2d Cir.4/10/13), 113 So.3d 471, writ denied, 13-1051 (La.11/15/13), 125 So.3d 1101.
The facts of this case involve an egregious attack on .an unsuspecting innocent victim in his own home for nothing more than a wallet full of money and a benefits card. The circumstances surrounding the attack were | Munconscionable and displayed an absolute disregard for human life.- When compared to the severity of the offense, Turner’s life sentence is neither grossly disproportionate, nor shocking to the sense of justice. This assignment of error is without merit.

Decree

For the foregoing reasons, Turner’s conviction and sentence are affirmed.
AFFIRMED.

. This includes any claim by Turner regarding the trial court’s authority to sentence him to anything other than life imprisonment, the denial of any opportunity to present mitigating evidence in support of a downward departure from the mandatory sentence and the trial court’s failure to take any,evidence related to sentencing. Even so, we note that the trial court heard arguments on several motions prior to sentencing during which Turner was permitted to make several statements. He argued only that no evidence connected him to the .crime and at no time admitted culpability. Despite Turner's protestations to *728 the contrary, the DNA evidence was direct scientific proof of his involvement in this heinous crime. His arguments for maintaining his innocence fail to satisfy the clear and convincing burden of proof for departure from the mandatory sentence.