Judgment rendered November 10, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 53,578-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                    Appellee

versus

JOHN CLAY BENSON                                      Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 19CR001397

Honorable Hamilton Stephens Winters, Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Holli Ann Herrle-Castillo

JOHN CLAY BENSON                          Pro Se

ROBERT STEPHEN TEW                        Counsel for Appellee
District Attorney

JUSTIN A. WOOLEY
Assistant District Attorney

* * * * *

Before MOORE, COX, and McCALLUM, JJ.

**McCALLUM, J.**

A jury convicted John Clay Benson ("Benson") as charged of computer-aided solicitation of a minor in violation of La. R.S. 14:81.3(A)(1) and (A)(4). Benson, who was 31 years old at the time of the offense, had exchanged text and Facebook messages of a sexual nature with a 14-year-old girl ("victim"). He had also texted a photograph of his penis to the victim. Benson admitted to his crime when testifying at his trial. Following his conviction, Benson was adjudicated a fourth-felony habitual offender and sentenced to 25 years at hard labor without benefit of parole, probation, or suspension of sentence.

Benson now appeals his sentence as being excessive. We affirm his conviction and sentence.

## FACTS

In early March of 2019, the victim, who lived in West Monroe, Louisiana, accepted a Facebook friend request from someone named Steve Benson ("Steve"). The victim and Steve communicated over the next week using Facebook Messenger as well as through text messages. They established their respective ages as being 14 years old and 31 years old in an early online exchange.

When the victim's mother ("mother") entered the victim's bedroom on March 10, she noticed that the victim was trying to conceal what she was doing on her smartphone. Believing that something might be amiss, the mother went through the victim's phone and discovered the victim had received inappropriate messages from an older man. The mother then contacted the Ouachita Parish Sheriff's Office ("OPSO").

Joshua Foster, a patrol deputy with OPSO at the time, responded to the call.[1] After quickly glancing at the messages the mother showed to him, Foster took possession of the victim's phone. Although they were unable to locate anyone named Steve Benson, OPSO officers found the name of John Clay Benson through the phone number used to the send the messages. Benson was a registered sex offender. Foster learned that Benson's date of birth was May 8, 1987, which would have made him 31 years old at the time the messages were sent. Foster was unable to locate Benson at his residence in Bawcomville, Louisiana. A neighbor informed Foster that Benson worked at Louisiana Plastics in West Monroe. Foster prepared a report and sent it to the OPSO's investigative division.

Investigator Michael McClain met with the victim and her mother on March 11. McClain, accompanied by uniformed officers, went to Louisiana Plastics, where they found Benson operating a forklift at the rear of the facility. When Benson saw them, he hurriedly climbed down from the forklift, which indicated to McClain that Benson may flee. Nevertheless, Benson did not escape through a nearby door that was open, but instead went to a podium and stood facing away from the officers. Benson was handcuffed, advised that he was being detained for questioning, and led away. When McClain stopped to explain to Benson's supervisor what was occurring, Benson fell to the ground.

McClain interviewed Benson later that morning. The audio and video of the interview were recorded. McClain told Benson that he would read a rights waiver form to him and that Benson would have the option of

---

[1] Foster was an OPSO investigator at the time of trial.

2

following along or just listening. Benson chose to listen. He signed the waiver form without reading it.

At first, Benson denied knowing the victim. However, he ultimately admitted to communicating with her through texts and Messenger, using the name of "Steve Benson." He stated that the victim considered them to be dating. He explained that he felt sorry for her, and that she threatened to harm herself if he ceased communicating with her. Benson denied trying to meet her at a local BMX track, but then stated that he sent her a text that he was at the track. He messaged her later that night asking her to sneak out of her home; however, he insisted that he just wanted to talk to her that night and was not going to do anything improper. Benson also sent a photo of his penis to the victim. Benson claimed that he first learned the victim was only 14 years old when someone apprised him of that fact a day earlier, but then he stated that the victim had told him her age. He also claimed that the victim initiated the discussions about sex.

McClain obtained an arrest warrant for Benson following the interview. A search warrant was also obtained that day to search Benson's Facebook account.

According to the messages obtained from Facebook, the victim confided in Benson on March 2 that she was depressed. On March 3, Benson and the victim told one another their actual ages. An exchange that date illustrated Benson's recognition of the age difference:

Benson: "Yep I can see I'm so dead by your dad"

Victim: "No not really"

Benson: "If he finds out are any body for U will be" [*sic*, here and below]

3

Victim: "My dad don't care who I really talk to"

Benson: "O but I don't need to get in trouble tho. So keep this between us"

Victim: "Keep what between us"

Benson: "Us talking don't tell No one"

Benson told the victim on March 3 that he was going to send a photograph to her.  He warned her not to share it:

Benson: "I'll show u a picture of me but u can't show no one promise"

Benson: "Are deleat it"

Victim: "Ok I will not show it anyone else I promise babe"

Benson:  "Don't let no one see it Not even your mom and dad"

On March 10, Benson asked the victim, "So we're do we stand[?]" When the victim replied that she did not know, Benson asked her, "So u don't now if we're dating are friends are what[?]"  The victim replied that they were dating.  Benson told the victim that he was about to ride his bike five to six miles to see her.  He also wrote, "Yea idk if your worth this" and "But idk I love u tho[.]"  Later that day, he again wrote to the victim that he loved her.  He also wrote, "I going to. Come over there and suck on. Them tites[.]"

A search warrant was also obtained for Benson's smartphone.  John Asmussen, who was a senior investigator for the OPSO at the time, extracted the digital contents of Benson's phone.[2]  He prepared a report containing all of the text messages between Benson's phone and the victim's phone.

---

[2] Asmussen was an investigator with the Louisiana State Police at the time of trial.

The first text message was sent on March 5. On March 6, Benson asked the victim where she lived. On March 9, Benson asked the victim about any prior sexual experiences. He texted, "I love u so I'll have to show u what to do[.]" He also texted, "I love u and I'll show u how and take are time[.]"

Benson asked the victim on March 9 to take off her clothes and send him a photograph:

Benson: "Why don't u take the clothes off and show me"

Benson: "So take it off show me a Pict of it please"

Benson: "I said take shorts and all off and show me it"

A few minutes later, Benson texted the victim, "Yep I won't to come lick on it with my toung[.]" He then asked the victim if her panties were still removed. Shortly thereafter, Benson texted the victim a photograph of his penis.

The victim told Benson on March 9 that she was with her mom on weekends but that she lived with her grandmother during the week. Benson asked her for the address of her grandmother's home. Benson then asked the victim if she had ever snuck out before as well as for the address of her mother's residence.

On July 17, 2019, Benson was charged by an amended bill of information with computer-aided solicitation of a minor in violation of La. R.S. 14:81.3(A)(1) and (A)(4) that occurred between March 1 and March 15, 2019. La. R.S. 14:81.3 provides, in relevant parts:

> A. (1) Computer-aided solicitation of a minor is committed when a person seventeen years of age or older knowingly contacts or communicates, through the use of electronic textual communication, with a person who has not yet attained the age of seventeen where there is an age difference of greater than

5

two years, or a person reasonably believed to have not yet attained the age of seventeen and reasonably believed to be at least two years younger, for the purpose of or with the intent to persuade, induce, entice, or coerce the person to engage or participate in sexual conduct or a crime of violence as defined in R.S. 14:2(B), or with the intent to engage or participate in sexual conduct in the presence of the person who has not yet attained the age of seventeen, or person reasonably believed to have not yet attained the age of seventeen.

. . . . .

(4) It shall also be a violation of the provisions of this Section when the contact or communication is initially made through the use of electronic textual communication and subsequent communication is made through the use of any other form of communication.

### *Trial*

A jury trial in this matter was held in August of 2019. The victim's mother testified that she contacted the OPSO after she discovered that the victim had been approached online by an adult male who then had conversations of a sexual nature with her. She stated that when she asked the victim to identify the man, the victim was reluctant to name him.

OPSO officers Foster, McClain, and Asmussen testified about the investigative work they conducted which led to Benson being charged with the instant offense. Portions of the recording of Benson's interview were played for the jury. Excerpts from the text messages and Facebook messages exchanged between Benson and the victim were filed into evidence.

The victim testified that her date of birth is March 16, 2004. She described how someone named Steve Benson added her as a friend on Facebook in March of 2019. She soon began receiving messages from Benson, and those messages, which included messages about wanting to have sex, indicated to her that Benson wanted to be more than just her

6

friend. The victim recalled that Benson tried to meet her at a BMX event where her brother was racing. He also wanted to meet her at her mother's house.

Benson testified at his trial. He did not dispute any of the witnesses' testimony, and he admitted that the text messages and Facebook messages were sent by him. Benson claimed that he felt in love with the victim, but he regretted what he had done.

The jury found Benson guilty as charged.

*Sentencing*

On September 20, 2019, a bill of information was filed charging Benson with being a fourth-felony habitual offender. The predicate convictions were simple burglary of an inhabited dwelling, distribution of a controlled dangerous substance, and contributing to the delinquency of juveniles.

The victim's mother provided a victim impact statement at a hearing conducted on October 17, 2019. She testified that the victim's innocence had been taken from her, and that the victim had lost a sense of trust. The victim was struggling with school and in her relationships, including with her family members. The mother explained that Benson's actions had affected their entire family, and that the impact of his actions will follow the victim throughout her life. The victim was in extensive therapy, which was expensive.

Benson was adjudicated a fourth-felony habitual offender on October 28, 2019. The trial court noted it had reviewed a PSI report and a letter written by Benson to the court. After considering various mitigating and aggravating factors, the court found: (i) there was an undue risk that Benson

would commit another crime if given a suspended sentence or probation; (ii) Benson was in need of correctional treatment in a custodial environment that could be provided most effectively by commitment to an institution; and (iii) a lesser sentence would deprecate the seriousness of the offense. Accordingly, the court sentenced Benson to 25 years at hard labor without benefit of probation, parole, or suspension of sentence. Sex offender treatment was ordered.

Benson filed a motion to reconsider sentence in which he asked the court to reconsider his sentence because it was excessive. The motion was denied. Benson has appealed his sentence.

## DISCUSSION

Benson's appeal counsel ("counsel") argues that Benson's sentence of 25 years at hard labor without benefits is excessive. Counsel maintains that the trial court did not give adequate consideration to mitigating factors and the sentence is disproportionate. Counsel acknowledges that Benson's sentence is closer to the minimum of 20 years than the maximum of life, but still argues it is excessive for him under the circumstances of this case.

A reviewing court imposes a two-prong test to determine whether a sentence is excessive. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects adequate consideration of the guidelines of the article. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596. The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence. La. C. Cr. P. art. 894.1(C). The articulation of the factual basis

for the sentence is the goal of art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence, resentencing is unnecessary even where there has not been full compliance with art. 894.1. *State v. Fontenot*, 49,835 (La. App. 2 Cir. 5/27/15), 166 So. 3d 1215.

The defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation are important elements to consider. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *State v. Boehm*, *supra*. There is no requirement that specific matters be given any particular weight at sentencing. *State v. Boehm*, *supra*.

Second, a sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166.

A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, a sentence will not be set aside as excessive. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Boehm*, *supra*.

At the time of Benson's offense, La. R.S. 15:529.1(A) provided in part:

9

(4) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life then the following sentences apply:

(a) The person shall be sentenced to imprisonment for the fourth or subsequent felony for a determinate term not less than the longest prescribed for a first conviction but in no event less than twenty years and not more than his natural life.

(b) If the fourth felony and no prior felony is defined as a crime of violence under R.S. 14:2(B) or as a sex offense under R.S. 15:541, the person shall be imprisoned for not less than twenty years nor more than twice the longest possible sentence prescribed for a first conviction. If twice the possible sentence prescribed for a first conviction is less than twenty years, the person shall be imprisoned for twenty years.

(c) If the fourth felony and two of the prior felonies are felonies defined as a crime of violence under R.S. 14:2(B), or a sex offense as defined in R.S. 15:541 when the victim is under the age of eighteen at the time of commission of the offense, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.

La. R.S. 14:81.3(B)(1)(a) states that "[w]hoever violates the provisions of this Section when the victim is thirteen years of age or more but has not attained the age of seventeen shall be fined not more than ten thousand dollars and shall be imprisoned at hard labor for not less than five years nor more than ten years, without benefit of parole, probation, or suspension of sentence."

Counsel argues that the trial court failed to adequately consider the mitigating factor of Benson's diminished mental capacity and that the sentence is disproportionate to the crime. Counsel concedes that the trial court contemplated the criteria found in art. 894.1 and discussed aggravating and mitigating factors. However, counsel argues that the issue of Benson's mental ability should have been given further consideration during sentencing.

Counsel maintains that evidence of Benson's mental capacity, which was excluded at trial, could have been used as a mitigating factor. Counsel asserts that the record still provides clues of Benson's possible mental deficiency. According to counsel, the messages that Benson sent to the victim were replete with spelling and grammatical errors, the messages were sometimes difficult to decipher, and the messages were not written in the style of a 31-year-old man. Benson did not read the Miranda waiver form himself or follow along as the investigators read it to him. Benson's sole mode of transportation was a bicycle. Finally, Benson dropped out of school in the ninth grade after being a special-education student. He never obtained a GED despite having the opportunity to do so while previously incarcerated.

Counsel also maintains that the sentence is shocking to one's sense of justice when it is considered that while the victim suffered psychological harm, Benson's contact with her was for a short period of time and she did not suffer any physical harm. Benson also expressed his remorse during the trial when he admitted to the jury that he had done everything he was accused of doing.

When a defendant fails to timely file a motion to reconsider sentence under La. C. Cr. P. art. 881.1, the appellate court's review of the sentence is limited to a bare claim of constitutional excessiveness. *State v. Mims*, 619 So. 2d 1059 (La. 1993); *State v. Jones*, 41,449 (La. App. 2 Cir. 9/20/06), 940 So. 2d 61. Benson filed a motion to reconsider sentence, but the only ground asserted was that his sentence was excessive. Because Benson's motion to reconsider sentence raised only a claim that the sentence imposed was excessive, he is relegated to a review of his sentence on that ground

11

alone. *See State v. Turner*, 50,221 (La. App. 2 Cir. 1/20/16), 186 So. 3d 720, *writ denied*, 16-0283 (La. 2/10/17), 215 So. 3d 700. Nevertheless, the record reveals that the trial court adequately considered the art. 894.1 factors.

In considering mitigating factors, the trial court found that Benson had a limited education and had shown some remorse. The court also discussed his family history. Benson was not married and had no children. He had four siblings, and his mother lived in West Monroe. Benson had a fairly regular work history. He appeared to be in good health, had never used drugs, and only occasionally drank alcohol on weekends.

The court considered the PSI and letter from Benson when determining his sentence. Benson wrote to the court that he had been a special-education student from first grade until he dropped out of school in ninth grade.

In his offender statement for the PSI, Benson admitted his behavior was a bad choice and he regretted doing it. He believed that he was a productive member of society as shown by his work history. He asserted that he had always reported to his probation officer and attended his sex offender treatment. The victim's mother requested that the victim not be interviewed for the PSI due to the psychological effects that the crime had caused.

Benson's criminal past was outlined in the PSI. He pled guilty in 2006 to simple burglary. He was sentenced to three years at hard labor, but the sentence was suspended. His probation was revoked in 2008 when he pled guilty to attempted simple burglary. He was sentenced to one year at hard labor for the attempted simple burglary conviction.

12

Benson pled guilty to simple burglary on February 23, 2010. He was sentenced to one year at hard labor. He was released in 2011 and remained on good-time parole until December 22, 2011.

Benson pled guilty to distribution of hydrocodone on January 4, 2012. He was sentenced to eight years at hard labor.

Benson pled guilty to contributing to the delinquency of a juvenile on June 29, 2017. He was sentenced to two years at hard labor. He was released on February 15, 2018, and was to remain on good-time parole until October 2, 2019.

The court noted that Benson was not a youthful offender. He had five prior felony convictions dating back to 2006. The PSI showed that Benson's earlier sex offense involved his meeting a 15-year-old girl online.

The court also noted that the victim's therapy sessions had already cost $1,770, and there will be more such expenses for her family in the future. Benson was in no position to reimburse the victim's family for the therapy costs. The court also believed that the victim will suffer from Benson's crime throughout her life, and it would very likely affect her trust in men.

Our review of the record does not unearth any abuse of discretion by the trial court when sentencing Benson. Benson's sentence of 25 years at hard labor is very near the minimum sentence of 20 years. His maximum sentencing exposure as an habitual offender was life imprisonment.

The crime of conviction is a very serious one and its commission had a significant impact on the victim. In light of the fact that Benson had already taken some steps to meet the victim, the damage caused by Benson most likely would have been greater if the victim's mother had not

13

discovered the clandestine communications.  This was also not Benson's first sexual offense involving an underage girl.

The fact that Benson was not a wordsmith when composing his text messages is not necessarily indicative of a lessened mental capacity on his part.  Illiteracy is not tantamount to incapacity.  The trial court was aware of Benson's limited education when it crafted this near-minimum sentence.  For all his asserted shortcomings, Benson was savvy enough to utilize social media to seduce an underage girl in what appears to have been a well-planned scheme.

Benson's sentence is neither shocking to the sense of justice nor a purposeless and needless infliction of pain and suffering.  The argument that his sentence is excessive is without merit.

## CONCLUSION

Benson's conviction and sentence are AFFIRMED.