Judgment rendered September 27, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,262-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                      Appellee

versus

ANTHONY D. CARTER                       Appellant

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. F-202106

Honorable Stephen Gayle Dean, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Edward K. Bauman

PENNY WISE DOUCIERE                   Counsel for Appellee
District Attorney

KENNETH DOUGLAS WHEELER
AMANDA MICHELE WILKINS
Assistant District Attorneys

* * * * *

Before COX, THOMPSON, and ELLENDER, JJ.

**COX, J.**

This criminal appeal arises out of the Fifth Judicial District Court, Richland Parish, Louisiana. A unanimous jury convicted Anthony Carter ("Carter") as charged with one count of first degree vehicular negligent injuring in violation of La. R.S. 14:39.2, and one count of hit-and-run driving resulting in death or serious bodily injury, in violation of La. R.S. 14:100. The trial court sentenced Carter to 5 years at hard labor for the first count and 10 years at hard labor for the second count, with each sentence to be served concurrently. Carter now appeals, alleging insufficiency of evidence and excessive sentence. For the following reasons, we affirm Carter's convictions and sentences.

## FACTS

On January 19, 2021, Carter was charged by bill of information with one count of first degree vehicular negligent injuring and one count of hit-and-run driving resulting in death or serious bodily injury. On April 18, 2022, trial commenced, wherein the following testimony was adduced:

First, Raven Lampley ("Lampley"), the victim in this matter, testified and identified Carter in open court. Lampley stated that she and Carter had previously dated. Regarding the incident, Lampley testified that she went to a Halloween party at the Delhi Civic Center ("Civic Center") on October 31, 2020, with Lakeisha Hale ("Hale") and a few other friends. Lampley acknowledged that while en route to the party, she drank about half of a frozen daquiri, but stated that she did not "feel the effects" of the drink. Lampley explained that when she arrived at the party, she parked on the right side of the road near a ditch, across from the Civic Center, facing south so the driver's side door was exposed to the road.

Lampley stated that before she went into the Civic Center, she saw a man carrying Carter out of the building and that Carter was "acting a fool," and appeared to be intoxicated. Lampley testified that she had been at the party for about an hour before she went outside with Hale to call her boyfriend and get something from her car. Lampley explained that although she had to cross the street and walk some distance down from the Civic Center to get to her car, she did not have any trouble seeing her surroundings because there were "a lot of light poles" and people outside. She stated that when she and Hale crossed the street, she made another phone call, and noticed that a black Charger exited the Civic Center parking lot, which paused at a stop sign at the end of the road, and began spinning.

Lampley stated that because the Charger was about five cars away from her, and she was almost to her car, she thought she was in a safe location. Lampley testified, however, that when she got to the car door, Hale yelled at her to watch out, but before she could react, the Charger crashed into her and pinned her against the car. Lampley stated that she did not know who hit her until the Charger left the scene and other people began yelling that "Ink" ran into her. She then clarified that "Ink" was Carter's nickname. Lampley testified that she was unable to move after she was hit, and she was eventually airlifted to University Medical Center in Jackson, Mississippi.

Lampley then recalled the extent of her injuries, which included two broken legs, a dislocated knee, a fractured hip, a hematoma, a shift in her pelvic bones, and the tissue from the bottom of her leg was torn and shredded off. Lampley then generally explained that she underwent numerous medical procedures and surgeries, and was still awaiting further

2

procedures to address additional issues and complications. Lampley testified that since the accident, she was unable to keep her jobs as a CNA and Sonic employee, she had to learn to walk again, struggled climbing stairs, and had a diminished relationship with her four-year-old son, in part, because she could no longer pick him up.

Lampley then testified that she received several Facebook messages from Carter after he was released. The State introduced the initial message Carter sent, and Lampley read as follows:

> Hey, I am sorry. I didn't know I hit nobody. I thought I just hit the ditch. But you know if I knew I hit anybody, especially you, I wouldn't got out the car. I just got out last night. I wanted to come see you and check on you but with the charges and everything, people saying it might not be a good idea because all y'all mad at me. And I don't need to be in no more that I am in now. But I do deeply apologize. I don't know what it might mean to you but I am. And if you don't mind me coming to check on you, I'm gonna ask momma to bring me. But if not, I can understand that too. But my number is ***-***-2748, if you need anything and you can "Inbox" or text back? I can come. Hope you doing all right. Get well.

Lampley stated that Carter contacted her several times thereafter, and in March of 2022, Carter asked her to drop the charges against him, and in turn, he would pay her medical bills, as well as additional money for pain and suffering. Lampley explained that she never received any money from Carter, and because he had not contacted her in almost a year, felt that he only contacted her because he needed help.

Next, Hale testified that she attended the party with Lampley. Hale admitted she also had a daquiri, but did not "feel [any] effects," and that Lampley did not appear intoxicated that night. Hale testified that at some point, she and Lampley left the building so Lampley could get something from her car. Hale explained that they crossed the street and walked a little

3

further down from the Civic Center to get to Lampley's car. Hale stated that when she and Lampley approached the car, they noticed a black Charger near a stop sign at the end of the road. Hale admitted she was not alarmed when she first saw the Charger because she did not think it would come toward them.

Hale then explained that because she was behind Lampley, she saw the Charger hit and pin Lampley to her car. She testified that the driver never got out, and instead, reversed and left the scene. On cross-examination, Hale acknowledged she initially told officers the driver hit Lampley's car and then Lampley, but stated the officer misinterpreted her statement. Hale then read from her written report, in which she primarily provided that she saw the driver of a black Charger hit Lampley and then Lampley's car.

The State then called Lakendra Finley ("Finley"), who identified Carter in open court. Finley testified she was parked in the Civic Center parking lot when she noticed a black Charger in the lot "spinning and burning rubber" before it exited the lot, went across the street, "fishtailed," and hit Lampley. Finley stated she called 911 and pursued the Charger when the driver drove away from the scene. Finley recalled that the driver was speeding, swerving, and at one point, ran off the side of the road. She then stated that after she gave the operator the Charger's plate numbers, she provided directions until an officer found them, and the driver returned to the Civic Center parking lot.

Next, Officer Tyrone Williams ("Officer Williams"), with the Louisiana State Police ("LSP"), testified that he was dispatched to the Civic Center concerning a pedestrian injury following a hit-and-run. Officer

4

Williams stated that when he arrived, he observed approximately 75 to 100 people in the area, Lampley was lying in a ditch, with a lot of blood around her, and had several open cuts that he described as almost unbearable to see. Officer Williams testified that dispatch then informed him that a concerned citizen followed and identified the vehicle involved as a black 2006 Charger. Officer Williams stated that when he came in contact with the Charger, it was swerving, and he followed it back to the Civic Center parking lot, where he identified Carter as the driver.

Officer Williams testified he could detect a strong odor of alcohol on Carter and observed an open bottle of beer between the driver and passenger seats as well as a half-empty bottle of gin on the passenger side floor. Officer Williams explained that because he smelled alcohol, and because Carter stumbled out of the vehicle and struggled to stand up, it was not safe to administer a field sobriety test; instead he arrested Carter and transported him to the Delhi Police Department, where an Intoxilyzer was administered.

Trooper Jason Henson ("Tpr. Henson"), of the LSP, testified that he administered the Intoxilyzer for Carter. He explained that to administer the test, he instructs people to blow air into the Intoxilyzer tube for several seconds; if the person expels air with enough force, the Intoxilyzer will indicate a sufficient breath was given to capture a sample. Tpr. Henson noted that the more impaired a person is, there is an increased difficulty in providing a sufficient sample. After he reviewed the video of Carter's Intoxilyzer test, Tpr. Henson testified Carter was argumentative, uncooperative, and struggled to expel a sufficient amount of air to yield a proper result. Tpr. Henson stated that during the second administration, the Intoxilyzer indicated that Carter's BAC was .256 grams percent. On cross-

5

examination, Tpr. Henson clarified that the Intoxilyzer functioned properly at all times and Carter's speech was not severely slurred so he understood what Carter said during the administration.

Mark Troha ("Troha"), an EMT paramedic for Northeast Louisiana Ambulance Service, testified he was dispatched to the Civic Center to assist with injuries related to a hit-and-run. Troha stated when he approached Lampley, she was in a ditch across from the Civic Center and appeared as though she had been run over, with open wounds and bones protruding from her leg. Troha stated the area was "pitch black" and he had to use phone lights from pedestrians at the scene and the light he brought with him, but transported Lampley to a nearby baseball field for better lighting to properly treat her injuries.

Troha testified that in his cursory examination of Lampley, there was no evidence she was intoxicated because she was alert, could provide her name, date, and location, but he noted Lampley was in a lot of pain. In his review of the extent of Lampley's injuries, Troha testified Lampley had a visibly open hole in her left leg where the bone broke through the skin and re-entered the body; the bone in her right leg was exposed and protruded outward; and he was unable to put her leg in a splint because body tissue immediately began to fall when her pant leg was cut. Troha testified that Lampley was labeled as a trauma patient and was administered 100 micrograms of Fentanyl, which he noted was about 50 times more potent than morphine and could have made Lampley appear to be intoxicated later.

Finally, Kerry Johnson ("Johnson"),of LSP's Applied Technology Unit,[1] was entered as an expert witness regarding Intoxilyzers and breath analysis. Johnson primarily testified that he repairs, inspects, and certifies Intoxilyzers. Johnson explained that in general, some factors can prevent Intoxilyzers from yielding a result; however, the instrument notifies the administrator of any error and no test can be given until the issue is resolved. Johnson stated that the Intoxilyzer issued to the Delhi Police Department was fairly new, was checked for calibration every four months, and the instrument itself is self-checking. Regarding the Intoxilyzer administered to Carter, Johnson stated the instrument was functioning properly eight days before and the day it was administered to Carter. After Johnson viewed the video of Carter using the Intoxilyzer, Johnson stated that nothing indicated the test was administered improperly, and Carter's results yielded a result of .256 grams percent, three times the legal limit.

After the State rested, Carter testified on his behalf.[2] First, Carter acknowledged his previous criminal history, which consisted of a 2016 misdemeanor conviction for disturbing the peace. Carter then testified that his sister hosted the party at the Civic Center. He stated he had only been at the party for a few hours before he decided to leave after an argument with some men at the party. Carter explained that after he left the parking lot, he drove to the stop sign at the end of the road, pressed the gas pedal too hard,

---

[1] Eugene Williams, an officer in the same unit, testified that the Intoxilyzers have built-in mechanisms to detect if anything interfered with the results. He also confirmed that the Intoxilyzer issued to the Delhi Police Department was functioning properly and yielded accurate results.

[2] Defense counsel recalled Lampley, who admitted she filed an insurance claim against Carter, but was informed Carter did not have insurance. Lampley stated she never received any money for her injuries or damages to her car.

and lost control of the vehicle. He stated that he tried to gain control of the vehicle but "fishtailed" instead. Carter stated that because it was dark, he thought he hit a ditch and left the scene.

Carter stated that after he left, he noticed a car followed him, so he stopped at his aunt's home and returned to the Civic Center when the car passed him because he thought something was wrong. He stated that when he got back to the parking lot, Officer Williams pulled him over and arrested him. Carter testified that after he was released, he never filed a report with his insurance company because his vehicle was not damaged, and he was never contacted about property damage stemming from the night in question. Carter then admitted he offered to pay Lampley's medical bills and asked her to drop the charges against him; he explained that he believed Lampley was the only one who could help him and his offer was a "good-faith showing."

On cross-examination, Carter stated he was sober when the incident occurred, he only had one cup of punch while at the party, and the two open bottles of alcohol Officer Williams found belonged to his brother. He then acknowledged that his Intoxilyzer results yielded a BAC of .256 grams percent. Carter admitted that there were cars parked on either side of the road and there were a lot of people at the party, but maintained that he never saw anyone outside. Carter admitted he had headlights on, but stated it was dark and did not realize he hit Lampley or her car. Carter reiterated he went back to the Civic Center because he felt something was wrong. Carter stated that he noticed that an officer followed him, but he did not pull over because the officer did not activate his lights.

8

After closing arguments, the jury returned a unanimous guilty verdict for both charges. During the sentencing hearing, the trial court reviewed Lampley's impact statement and Carter's PSI and letter to the court. The trial court explained that although Carter's criminal history consisted only of a misdemeanor conviction and a misdemeanor charge, it noted that Lampley's injuries were severe and several aspects of her life were now significantly impaired. Moreover, the trial court highlighted that Carter never expressed remorse for his actions and his letter submitted to the court focused only on the hardships and difficulties he would face.

Thereafter, the trial court sentenced Carter to five years at hard labor for the first count and 10 years at hard labor for the second count, with each sentence to be served concurrently. This appeal followed.

## DISCUSSION

*Sufficiency of the Evidence*

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L.Ed. 2d 248 (2004); *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797. The *Jackson* standard, now legislatively embodied in La. C. Cr. P. art. 821, does not afford appellate courts with a means to substitute its own appreciation of the evidence for that of the fact finder. *Steines, supra*.

The *Jackson* standard also applies in cases involving both direct and circumstantial evidence. An appellate court which reviews the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is viewed as such, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983).

Likewise, if a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *see also*, *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 17-1894 (La. 6/1/18), 243 So. 3d 1064. The appellate court will review the evidence in the light most favorable to the prosecution and determine whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584, *writ not cons.*, 12-0062 (La. 4/20/12), 85 So. 3d 1256.

In the absence of any internal contradiction or irreconcilable conflict with physical evidence, the testimony of the witness, if believed by the trier of fact, alone is sufficient support for a requisite factual conclusion. *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 153 So. 3d 438; *State v. Wiltcher*, 41,981 (La. App. 2 Cir. 5/9/07), 956 So. 2d 769. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a

determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36, 180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2997 (La. 6/27/03), 847 So. 2d 1255. The appellate court neither assesses the credibility of witnesses nor reweighs evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422.

Here, Carter was charged with one count of first degree vehicular negligent injuring, and one count of hit-and-run driving resulting in death or serious bodily injury. Regarding count one, La. R.S. 14:39.2 provides:

> A. First degree vehicular negligent injuring is the inflicting of serious bodily injury upon the person of a human being when caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance whenever any of the following conditions exists:
>
> > (1) The offender is under the influence of alcoholic beverages.
> >
> > (2) The offender's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.

To establish that an offender committed either vehicular homicide or first degree vehicular negligent injuring, the State must prove beyond a reasonable doubt that the offender's unlawful blood alcohol concentration at the time of the accident, combined with his operation of a vehicle, caused serious bodily injury to someone. La. R.S. 14:39.2; *State v. Louis-Juste*, 50,806 (La. App. 2 Cir. 8/10/16), 201 So. 3d 308; *State v. Christophe*, 12-82

(La. App. 5 Cir. 10/16/12), 102 So. 3d 935, *writ denied*, 12-2432 (La. 4/19/13), 111 So. 3d 1029.

Here, Carter does not contest that he was driving or that he was under the influence at the time of the accident. Therefore, the only matter at issue is whether the State proved beyond a reasonable doubt that Carter's intoxication was the cause of Lampley's injuries as a result of the accident. La. R.S. 14:39.2 further requires the State to establish a causal connection between the defendant's unlawful blood alcohol concentration and the victim's injuries. Causation is a question of fact to be considered in light of the totality of circumstances surrounding the ultimate harm and its relation to the prohibited conduct. *State v. Louis-Juste*, *supra*.

In brief, Carter asserts that Lampley having drunk half a daiquiri contributed to her injuries. However, Lampley testified that although she drank on the night of the accident, she did not "feel the effects" of the drink. Moreover, Troha testified that one of his first tasks was to determine whether Lampley was intoxicated before he could administer any medication. In his assessment, Troha testified there was no evidence Lampley was intoxicated as she was alert and could answer several questions including her name, date, and location.

Carter further asserts that the area around the Convention Center was "pitch black" so he did not realize he hit Lampley or her vehicle but was under the impression he ran into a ditch. Although Troha confirmed there was little lighting at the scene of the accident, Carter testified his headlights were on during that time and no testimony was presented that there were any obstacles or roadblocks thwarting Carter's ability to see clearly; as such, he should have reasonably been able to see if any pedestrians or other obstacles

12

were on the roadway.  Moreover, Finley testified that she witnessed Carter speeding and swerving, and at one point, witnessed him run off the side of the road.  Likewise, Officer Williams testified that he also witnessed Carter swerving, could smell a strong odor of alcohol on Carter, observed two open bottles of alcohol in Carter's vehicle, and importantly, noted that Carter was so impaired he stumbled getting out of his vehicle and was unable to safely perform a field sobriety test.

Given Carter's excessive BAC, eyewitness testimony that Carter was swerving while driving, and that Carter had his headlights so he could see his surroundings, we find that the evidence presented was sufficient to support the jury's conclusion that but for Carter's intoxication, Lampley's injuries would not have occurred.

Regarding count two, La. R.S. 14:100 provides:

A. Hit and run driving is the intentional failure of the driver of a vehicle involved in or causing any accident, to stop such vehicle at the scene of the accident, to give his identity, and to render reasonable aid.

B. For the purposes of this Section:

(1) "To give his identity," means that the driver of any vehicle involved in any accident shall give his name, address, and the license number of his vehicle, or shall report the accident to the police.

(2) "Serious bodily injury" means bodily injury which involves unconsciousness, extreme physical pain, or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.

In this case, it has been established that Carter operated a motor vehicle and was involved in the accident that caused Lampley's injuries.  Moreover, Lampley, Hale, and Finley all testified that after Carter collided with Lampley, he never stopped to render any form of aid or identify

13

himself. Moreover, Carter also testified that he never got out of his vehicle to see what happened, but instead, reversed and left the scene. Although Carter eventually returned to the Convention Center parking lot, he testified that he only did so because he thought something was wrong and not to identify himself as the person who struck Lampley.

Carter maintains that he was unaware he ever hit a person but was under the impression he hit a ditch. However, at trial, Carter stated that at the time of the accident, he was aware there was a party with a significant number of people in attendance in a poorly lit environment with cars parked on either side of the road. Given this, we find there was sufficient evidence for a jury to conclude that Carter knew or should have known that he struck Lampley with his vehicle. It is uncontroverted that Carter failed to exit his vehicle, identify himself, or render aid; moreover, there was no justification for Carter in failing to check his surroundings under these circumstances.

After a review of the evidence and testimony presented, we find that the jury did not err in rejecting Carter's claim, as there was more than sufficient evidence for any rational trier of fact to conclude that all of the essential elements for Carter's convictions were proven beyond a reasonable doubt. Accordingly, this assignment of error lacks merit.

*Excessive Sentence*

By his second assignment of error, Carter argues that his sentences are excessive and in violation of the 8th Amendment's prohibition against cruel and unusual punishment. Carter alleges that his concurrent sentences were not particularized to him as an offender with a criminal record that consists only of a "few misdemeanor charges, and a misdemeanor conviction for disturbing the peace." He further argues that his sentences were not "within

14

the limits of appropriate sentences for similar crimes," i.e., that maximum sentences for these offenses have typically been imposed in cases where the defendant had a significant history of a similar prior offense.

Appellate review to determine whether a sentence is constitutionally excessive is a two-pronged inquiry whereby the first considers whether the trial court took cognizance of the guidelines set forth in La. C. Cr. P. art. 894.1, and the second considers constitutional excessiveness. *State v. Wing*, 51,857 (La. App. 2 Cir. 2/28/18), 246 So. 3d 711. However, in this case, no motion to reconsider sentence was filed; therefore, this Court's review is limited to the constitutional excessiveness of the sentence alone. La. C. Cr. P. art. 881.1; *State v. Williams*, 51,667 (La. App. 2 Cir. 9/27/17), 245 So. 3d 131, *writ not cons.*, 18-0017 (La. 8/3/18), 248 So. 3d 322; *State v. Turner*, 50,221 (La. App. 2 Cir. 1/20/16), 186 So. 3d 720, *writ denied*, 16-0283 (La. 2/10/17), 215 So. 3d 700.

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So. 2d 1; *State v. Mandigo*, 48,801 (La. App. 2 Cir. 2/26/14), 136 So. 3d 292, *writ denied*, 14-0630 (La. 10/24/14), 151 So. 3d 600. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166. *State v. Wing*, *supra*. The trial court maintains wide discretion in the imposition of sentences within statutory limits, and absent a showing of manifest abuse, an imposed sentence will not be set aside as excessive. *State v. West*, 53,526 (La. App. 2 Cir. 6/24/20), 297 So. 3d 1081.

Therefore, appellate review does not consider whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Dale*, 53,736 (La. App. 2 Cir. 1/13/21), 309 So. 3d 1031; *State v. Davis*, 50,149 (La. App. 2 Cir. 11/18/15), 181 So. 3d 200.

Regarding Carter's conviction for first degree negligent injuring, La. R.S. 14:39.2(D) provides:

> Whoever commits the crime of first degree vehicular negligent injuring shall be fined not more than two thousand dollars or imprisoned with or without hard labor for not more than five years, or both.

Further, with respect to his conviction for hit-and-run driving resulting in death or serious bodily injury, La. R.S. 14:100(C)(2) provides:

> Whoever commits the crime of hit-and-run driving, when death or serious bodily injury is a direct result of the accident and when the driver knew or should have known that death or serious bodily injury has occurred, shall be fined not more than five thousand dollars or imprisoned with or without hard labor for not more than ten years, or both.

After a review of the record and consideration of the facts of the instant case, we are unable to say that the trial court abused its discretion in sentencing Carter.

The record in this case reflects that the trial court appropriately sentenced Carter; namely, the trial court fully complied with the factors enumerated in La. C. Cr. P. art. 894.1, finding that there were no mitigating factors present, and noting a number of aggravating factors, including Carter's "extreme impairment" as evidenced by his BAC of .256 grams percent, three times the legal limit. The trial court also noted that Carter's "complete disregard [for] the safety or well-being of others" ultimately resulted in the "extremely serious life-threatening injuries" and "serious permanent disfigurement" Lampley suffered.

16

Further, the trial court reviewed Carter's social history, PSI, and several letters written on Carter's behalf. The trial court acknowledged that Carter's criminal history consisted of misdemeanor charges and a misdemeanor conviction; however, the trial court determined that because of Carter's actions during and after the incident, a lesser sentence would deprecate the seriousness of his actions. Given that Carter expressed no true remorse for his actions, as evidenced in his letter to the court which primarily focused on the detriment he and his family would suffer without ever expressing concern for the burden Lampley and her family would have to endure, we agree with the trial court's ruling.

Moreover, we note that when Carter did contact Lampley, it was to convince her to drop the charges filed against him and to offer Lampley money for her medical expenses, which she never received. In reviewing the totality of the facts of this case, this court finds that in light of Carter's excessive BAC, lack of remorse for his careless behavior, the extent and measure of Lampley's injuries, and that Carter's sentences fall within the statutory range for both offenses, Carter's sentences are neither grossly out of proportion to the severity of the offenses, nor do they shock the sense of justice.

Accordingly, we find that the trial court did not abuse its discretion in imposing these sentences, and this assignment of error is without merit.

## CONCLUSION

For the aforementioned reasons, Carter's convictions and sentences are affirmed.

**AFFIRMED.**

17