BROWN, Chief Judge.
|TOn June 5, 2009, 20-year-old Joshua R. Parker and his friend Don Heflin arranged a drug transaction with 17-year-old Phillip Livigni and his friend Caleb Duos. The four agreed to meet at University Elementary School in Shreveport, Louisiana. Moments into their encounter, defendant, Joshua R. Parker, “upped” a weapon and shot Livigni in the back. Li-vigni died of his injuries. A week later, defendant was apprehended in Rhode Island, while Heflin turned himself in to authorities in Massachusetts. Defendant was indicted for first degree murder on August 28, 2009; however, the charge was later amended to second degree murder. *473 A jury convicted defendant of second degree murder, and he was subsequently sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence. Defendant now appeals. We affirm defendant’s conviction and sentence.

Discussion

As relevant to this case La. R.S. 14:30.1 provides:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery, first degree robbery, second degree robbery, simple robbery ... even though he has no intent to kill or to inflict great bodily harm.
There is no dispute that defendant shot and killed Phillip Livigni. In his statement to the arresting officer, defendant claimed that after arriving at University Elementary School he believed that Livig-ni and Duos were going 12to rob him. Defendant claims that Livigni was pulling a weapon from his pocket and that he shot Livigni once in self-defense.
James Traylor, M.D., a forensic pathologist at LSU Health Sciences Center in Shreveport, was qualified as an expert in forensic pathology and testified with regard to the autopsy he performed on Li-vigni. According to Dr. Traylor, the bullet entered Livigni’s back just above the elbow, and traveled from left-to-right, from back-to-front, and from top-to-bottom. While the victim suffered injuries to his 11th rib, lung, pancreas, liver, and small bowel, the cause of death was the laceration of the abdominal aorta artery. Dr. Traylor noted that there was no soot in the wound, which suggested to him that there was more than two inches of distance between the gun and the victim at the time it was discharged.
As stated by the prosecutor, “The grand jury chose to indict [Don Heflin] for simple burglary, did not find him criminally responsible in connection with the homicide.” Although his case was pending, Heflin agreed to testify in this case.[1] Heflin testified that he was with defendant at University Elementary School at the time of the shooting. He said that he and defendant were there to purchase marijuana from Livigni, and that Livigni was supposed to buy Oxycontin pills from defendant. He, defendant, and defendant’s girlfriend arrived at the meet before Duos and Livigni. After waiting about 10 minutes Heflin called Livigni to see if they were almost there. Livigni informed them that they were just around the corner and would be there soon. Defendant told his girlfriend to go wait in |8the car.[2] According to Heflin, defendant and Livigni had never met, so when Livigni and his friend arrived, “Josh came across and was like, is this your friend. I’m like, yeah. And he upped on him with a pistol.” Heflin stated that when defendant pulled out his gun, “[defendant] told [Livigni] to give him his shit.” After that, Heflin testified, defendant either spun Livigni or Livigni was turning to look at Heflin, and then defendant shot Livigni in the back. Heflin said that Livigni had not attacked or threatened them, nor was there any indication that Livigni had a weapon. Lastly, Heflin testified that, although he saw defendant go through Livigni’s pockets, he did not actually see him take anything. Later in *474 the car, however, defendant showed Heflin Livigni’s cell phone.
On cross-examination, Heflin gave somewhat conflicting testimony with regard to the actual shooting. He first claimed that defendant “pointed” the gun at Livigni’s “face, just in that chest, face area.” Later, he said that defendant was “waving” the gun as opposed to holding it steady. Hef-lin admitted that defendant “looked kind of stunned at what he actually just did.”
Also present that day was Caleb Duos, who testified that on the day of the murder, Livigni told him that he was going to buy drugs from someone at University Elementary School. Livigni asked Duos to accompany him because he was afraid that the dealer “might , jump him.” According to Duos, as the two approached Heflin, Duos was suspicious “because of [Heflin], because the way he was acting. He was kind of |4backing up trying to hide from me, and then he was pointing toward us.” Duos did not even initially see defendant because he was “hiding” behind a building. Duos stated that defendant quickly approached them and,. without provocation, pulled out a gun. According to Duos, “[defendant] cocks [the gun], holds it at his kind of waist, lower area, then he was like, give me the money ... and then all I know is [Livigni] turning around, I’m thinking to turn to talk to [Heflin], that’s when [defendant] ... pulled the trigger.” Duos ran to a local gas station and called 911.
Rhode Island State Police Lieutenant John P. A’Vant testified that on June 16, 2009, at approximately 2:30 p.m., he and fellow officers apprehended a young man who was wanted for murder in Louisiana. Though the young man originally identified himself as Jim Baker, he later admitted to officers that he was Joshua Parker. A’Vant read defendant his rights and obtained a recorded statement. On cross-examination, A’Vant said that Parker’s statement was not coerced and that he did not appear to be under the influence of drugs or alcohol.
As part of the state’s case, Parker’s recorded statement was played in open court. According to the statement, Parker had been unemployed for the past few months and was “getting pretty low” on money. Therefore, on June 5, 2009, defendant, his fiancée, and Heflin went in search of a business that would exchange cash for gold coins that Heflin had taken from his grandmother. They managed to find a coin exchange business that purchased one coin for $15.
| .^Defendant said that Heflin called several drug dealers looking to purchase marijuana and Oxycontin pills for themselves. Parker claimed he had roughly $65, which would have been enough to buy an ounce of marijuana. Heflin located a dealer, Phillip Livigni, and arranged a meeting with him at University Elementary School. Parker, armed with a .38 Special, drove himself, his fiancée, and Heflin to the school and waited under a breezeway for Livigni to arrive. Heflin had stolen the gun in a car burglary.
When Livigni approached, Livigni “said something like: give the shit up, or something,” and swung at defendant. Livigni then stuck his hand in his pocket, and, believing he had a weapon, defendant “reacted and pulled my gun and, and I pushed him. As soon as I pulled my gun, he looked like he was pulling his hand out, and I got a good — I loo — got a good look at it and Don (Heflin) did too.” Defendant said that Livigni “kind of turned a little bit and I pulled, you know, and I didn’t even aim or nothing, I just shot, and I believe it struck him in the back ... my elbow was bent and everything, you know, it wasn’t aimed or nothing, you know, I just fired and I believe I struck him in the back, and *475 when I fired, we turned around and hauled ass.”
Defendant told A’Vant that he threw the gun in the lake at Toledo Bend. Although he intended to turn himself in, he said that he first agreed to drive Heflin to his home in Rhode Island. He denied taking any money from Livigni or Duos, and maintained that he shot Livigni in self-defense. Defendant did not testify at his trial.
| (¡Detective Eric Farquhar, a homicide detective with the Shreveport Police Department at the time of the incident, testified that on June 5, 2009, he responded to a reported shooting at University Elementary School in Shreveport, Louisiana. Upon arriving at the scene Det. Farquhar interviewed Caleb Duos, Livigni’s friend and an eyewitness to the shooting. Det. Farquhar stated that after conducting additional interviews he was able to identify defendant and Heflin as potential suspects. Det. Farquhar informed both Heflin’s grandmother and defendant’s brother that the two men were wanted for questioning in connection with the shooting. More than a week after the shooting, Det. Far-quhar was contacted by Rhode Island State Police Lieutenant John A’Vant. Lt. A’Vant informed Det. Farquhar that defendant had been apprehended and that he had made a post-Miranda statement. Approximately one week after defendant’s apprehension, Heflin turned himself in to the authorities in Massachusetts. Both were subsequently extradited to Caddo Parish, Louisiana.
According to the testimony of Det. Far-quhar, during the course of his investigation he received information that the weapon used to kill Livigni had been thrown into a pond on defendant’s grandfather’s property. After obtaining a search warrant, Det. Farquhar sent a dive team to the location to search for the weapon. A-though the weapon was not recovered, the two halves of the victim’s cell phone were found in the pond.

Sufficiency of the Evidence

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to |7the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert, denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).
The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, 05-0213 (La.01/19/06), 921 So.2d 94.
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Gamer, 39,731 (La.App.2d Cir.09/8/05), 913 So.2d 874; State v. Dooley, 38,763 (La.App.2d Cir.09/22/04), 882 So.2d 731, writ denied, 04-2645 (La.02/18/05), 895 So.2d 30. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20.
Viewing the evidence in a light most favorable to the prosecution, the evidence adduced at trial was sufficient to convict defendant of second degree murder. First, the evidence was sufficient to *476 prove that defendant had the specific intent to kill Livigni. Specific intent to kill can be inferred from a person pointing and firing a gun at another. State v. Robinson, 02Jj3698 (La.04/14/04), 874 So.2d 66; State v. Brown, 42,054 (La.App.2d Cir.08/29/07), 965 So.2d 580. In his statement, defendant did not claim that the gun accidentally discharged. Both Heflin and Duos testified that defendant, standing only a few feet away from Livigni, pointed the gun and fired at Livigni, striking him in the back. Thus, this first provision of the second degree murder statute is satisfied.
Next, the state proved that Livigni was not killed in self-defense. Duos and Heflin both testified that defendant was the aggressor. Heflin said there was no indication that Livigni was armed, nor was any weapon found on Livigni. As such, the facts do not suggest that defendant was in imminent danger of losing his life or receiving great bodily harm. Therefore, the state sufficiently proved that defendant did not shoot Livigni in self-defense.
The state also put forth sufficient evidence to prove that defendant killed Livig-ni during the commission or attempted commission of an armed robbery. According to both Duos and Heflin, defendant pulled out a gun and told Livigni to “give him the shit,” which could reasonably be construed to mean money or drugs. Hef-lin then watched defendant rifle through the victim’s pockets, and later saw him with Livigni’s cell phone. Lastly, Detective Farquhar’s testimony established that Livigni’s cell phone was recovered from defendant’s grandfather’s pond.

Excessive Sentence

Defendant was convicted as charged of second degree murder. The statutorily mandated sentence for second degree murder is punishment by |3life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). Where there is a mandatory sentence there is no need for the trial court to justify a sentence it is legally required to impose. State v. Koon, 31,177 (La.App.2d Cir.02/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App, 2d Cir.1992).
To rebut the presumption that the mandatory sentence is constitutional, the defendant must clearly and convincingly show that he is exceptional, namely, that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Johnson, 97-1906 (La.03/04/98), 709 So.2d 672; State v. Hill, 42,025 (La.App.2d Cir.05/09/07), 956 So.2d 758; State v. Chandler, 41,063 (La.App.2d Cir.09/08/06), 939 So.2d 574.
Defendant asks this court to declare that, under the facts of this particular case, the mandated sentence is unconstitutionally excessive. Defendant argues for a downward departure from the mandatory sentence due to mitigating factors particular to this case. Defendant claims that he has shown remorse for his actions, and that a mandatory life sentence is excessive considering he was a 20-year-old first time offender.
In addition to the senseless and brutal shooting of Livigni, defendant’s actions in the aftermath of the shooting were callous and calculated, not remorseful. Defendant robbed Livigni as he was lying on the ground dying. He and Heflin spray painted his car, fled to Rhode Island and had the car crushed, all in an attempt to avoid arrest. And lastly, when | infinally apprehended, defendant concocted a story to try and shift blame onto the victim.
*477 Considering the aforementioned, we find that defendant’s mandated life sentence is neither grossly disproportionate to the severity of the offense nor shocking to the sense of justice.

Conclusion

For the foregoing reasons, defendant’s conviction and sentence are affirmed.

. Heflin was represented by counsel who sat in the courtroom throughout his testimony.

. The girlfriend did not testify.