Judgment rendered March 1, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,947-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                           Appellee

versus

RONALD BERRY PARKER                      Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 368,861

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Sherry Watters

JAMES E. STEWART, SR.                        Counsel for Appellee
District Attorney

WILLIAM J. EDWARDS
KODIE K. SMITH
ALEXANDRA L. PORUBSKY
Assistant District Attorneys

* * * * *

Before ROBINSON, MARCOTTE, AND ELLENDER, JJ.

MARCOTTE, J.

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Christopher Victory presiding. Defendant, Ronald Berry Parker, was convicted of second degree murder under La. R.S. 14:30.1. Parker was sentenced to life imprisonment, to be served without the benefit of probation, parole, or suspension of sentence. Parker now appeals, and for the following reasons, we affirm his conviction and sentence.

## FACTS

On the afternoon of July 20, 2019, the Shreveport Police Department received a 911 call from a man who identified himself as Ronald Parker; he stated that he had just shot someone in the front yard of his neighbor, Ola Mae Smith ("Ms. Smith"), following a dispute over parking. Officers were dispatched to the scene and arrested Parker for the shooting death of Roderick Gaut.

On October 22, 2019, Parker was charged by bill of indictment with the second degree murder of Mr. Gaut, in violation of La. R.S. 14:30.1. Parker waived his right to a jury trial pursuant to La. C. Cr. P. art. 780, and a bench trial proceeded on July 1-2, and 6, 2021.

Officer Gerald Thomas ("Off. Thomas") is a supervisor and records custodian with the communications division of the Shreveport Police Department ("SPD"). He testified concerning the event chronologies generated for the 911 calls made on the day of the incident, and was able to authenticate the event chronology report produced by his office, which was admitted. Off. Thomas confirmed that a 911 call was made at 3:13 p.m. on July 20, 2019, from Parker.

The state played an audio recording of the 911 call made by Parker after the shooting. Officer Kourtney Pennywell ("Off. Pennywell") is the 911 dispatcher for SPD who received the call, and she confirmed that the 911 call played for the court was the same one she received on the day of the incident. In the 911 call, Parker reports that he just shot a man because that man had pushed him to the ground. When questioned by Off. Pennywell as to why the man pushed him, Parker first claims that he doesn't know then admits that it was due to a parking dispute. Also in the 911 call, Parker is heard telling Off. Pennywell, "I only shot him once."

Dr. James Traylor testified as an expert in the field of forensic pathology. Dr. Traylor performed an autopsy of Mr. Gaut on July 21, 2019, and determined that his cause of death was a single penetrating gunshot to the chest. Dr. Traylor recovered a bullet from Mr. Gaut's body and determined that the bullet entered Mr. Gaut at a slight downward trajectory. He confirmed various photographs that were admitted which he took in connection with his autopsy showing Mr. Gaut's face, the entry wound from the bullet, and the bullet recovered from Mr. Gaut's body. Finally, Dr. Traylor authenticated his autopsy report which was admitted and which sets forth the cause of death.

Sergeant Jennifer White ("Sgt. White") is employed in the crime scene investigations unit of SPD. During her testimony, she was shown and confirmed that she took a total of 42 photographs depicting the crime scene, the area surrounding the crime scene, and Parker's residence. Sgt. White was then shown a .22 caliber magnum revolver, along with four .22 magnum cartridges, one fired .22 magnum cartridge case, and a knife, and confirmed that they were all the same ones collected from the crime scene on the day of

2

the incident. On cross-examination, Sgt. White testified that the .22 caliber magnum revolver collected at the scene did not have a trigger guard on it that could have blocked accidental discharge of the weapon.

Officer Natalie Zweydoff ("Off. Zweydoff") is a patrol officer with SPD. She testified that on the day of the shooting, she was dispatched to block of East Washington Street in Shreveport where the incident occurred. When she arrived at the crime scene, she found a large gathering of people standing around Mr. Gaut, who was lying in the grass in the front yard of Ms. Smith's house. She observed that Mr. Gaut was bleeding from a chest wound but still had a faint pulse, so she administered CPR.

Ola Mae Smith owned the house next door to Parker where the shooting occurred. Ms. Smith testified that as part of her preparations for her brother's funeral, she asked Parker if he would permit a member of her family to park in his driveway, as she knew space at her house would be limited. Ms. Smith testified that Parker had permitted such an arrangement in the past in connection with her mother's funeral. Ms. Smith testified that Parker agreed to allow members of her family to park in his driveway. She further testified that until the day of the shooting, Parker had been a friendly neighbor whom she would sometimes bring food to. Ms. Smith identified Parker in the courtroom.

Officer Christopher Collins ("Off. Collins") is a patrol officer with SPD. Off. Collins testified that when he arrived at the scene of the shooting, he found Mr. Gaut not breathing and lying in the grass in the front yard of Ms. Smith's house with blood coming out of his face. Witnesses on the scene then directed Off. Collins to the neighboring house on East Washington Street, where they said Parker was located. Parker eventually

3

emerged from his house and Off. Collins handcuffed him and placed him in a patrol car. Off. Collins testified that he and other SPD officers then entered the residence, secured it, and recovered a .22 caliber magnum revolver from on top of Parker's refrigerator. Off. Collins identified Parker in the courtroom as the same man he arrested that day.

Mr. Gaut's wife of sixteen years Christana Gaut was present at Ms. Smith's house on the day of the incident and witnessed her husband's shooting death. Ms. Gaut testified that she knew Parker as her mother's neighbor, and she identified him in the courtroom. Ms. Gaut testified that she and her family were on their way to bury her uncle when her husband called to inform her that their son Roderick J. Gaut, II ("R.J.") needed to move his truck from Parker's driveway because Parker was upset about it. Mr. Gaut stayed at the house during the funeral so that he could prepare food for the repast following the funeral.

Ms. Gaut testified that after receiving this phone call from her husband, she returned to her mother's house with her son, R.J., so that he could move his truck as requested. After R.J. moved his truck, Ms. Gaut observed Parker continuing to pester R.J., who at that point was located in Ms. Smith's front yard. According to Ms. Gaut, R.J. then called to his dad for assistance. Ms. Gaut then observed Mr. Gaut emerge from the carport of Ms. Smith's house and approach Parker, telling him to calm down since R.J.'s truck had already been moved. At that point Ms. Gaut observed Parker confront Mr. Gaut and point in his face. Ms. Gaut then saw Mr. Gaut respond to Parker's aggression by pushing Parker to the ground.

Ms. Gaut testified that, "Instead of just getting up, [Parker] came out with the gun and shot [Mr. Gaut] in the chest." Ms. Gaut specifically

4

recalled seeing Parker aim his gun at Mr. Gaut before shooting him. After Parker shot Mr. Gaut in the chest, Ms. Gaut observed Parker point the gun at her and at the other family members in the yard before walking over to Mr. Gaut's lifeless body and patting him on the head. Ms. Gaut also observed that Parker appeared to have a knife in his other hand. When Parker had his gun pointed at her, Ms. Gaut testified that she screamed "please don't shoot me" at him. She then stated that Parker "walked back to his house like nothing ever happened." After the shooting, Ms. Gaut testified that Parker never said anything indicating that what he had just done was accidental.

R.J. was Mr. Gaut's son and also witnessed his father's shooting death. He testified that on the day of the incident, he went with his family to his uncle's funeral at Stoner Hill Baptist Church. Before the funeral, R.J. testified that he arrived at the house of his grandmother, Ms. Smith, driving his grandfather's red truck and was told by another relative to park the truck in Parker's driveway. R.J. stated that he was told that permission had been obtained to use Parker's driveway for parking. R.J. then rode in his mother's car to the funeral.

Following the funeral, R.J. testified that his plan had been to go to the burial site with the rest of his family but that his father called and told him that Parker was upset about R.J.'s truck in his driveway and that he needed to come move it. R.J. and his mother then came back to the property so that he could move the truck. R.J. testified that as soon as he got out of the truck after moving it, Parker opened his garage door and came toward him. R.J. then identified Parker in the courtroom. R.J. testified that Parker at first thanked him for "moving your damned truck off of my property." When R.J. questioned Parker about what he had just said, Parker became

5

belligerent and eventually patted his right pant pocket, saying "I've got something for you." R.J. then called out to his father for help.

After Mr. Gaut came outside, R.J. testified that he heard Parker and his father exchange words, with his father telling Parker to calm down since the truck had been moved and that Parker now needed to get off of their property. R.J. testified that at this point Parker "bumped" his father, and his father responded by pushing Parker to the ground. R.J. testified that he then witnessed Parker shoot his father. R.J. stated that all of this occurred in the front yard of his grandmother's house. After the shooting, R.J. said Parker waved his gun at everyone nearby and patted his father on the head before walking back inside his house next door.

Flautesha Graham also witnessed Mr. Gaut's shooting. On the day of the shooting, Ms. Graham was in the funeral procession with her son, Tahj Graham, Ms. Gaut, and R.J. when Mr. Gaut called to inform them of the need to have R.J. come back to Ms. Smith's house to move his truck. Ms. Graham testified that when they arrived at Ms. Smith's house, R.J. immediately moved his truck from Parker's driveway to a parking spot along the street on the opposite side of East Washington Street.

Ms. Graham testified that as R.J. was walking back towards Ms. Smith's house, Ms. Graham saw Parker emerge from his house and walk toward R.J. on Ms. Smith's front lawn. Ms. Graham then identified Parker in the courtroom. Ms. Graham testified that she saw Parker pestering R.J. which caused R.J. to seek help from his father. She then saw Mr. Gaut come out of the carport area of Ms. Smith's house to talk to Parker. She heard Mr. Gaut telling Parker that since the truck had been moved, Parker should just let it go and return to his house. Ms. Graham testified that she then saw

6

Parker get inches away from Mr. Gaut in an aggravated state before Mr. Gaut pushed Parker to the ground. She then saw Parker get back up, pull out a gun, and with no hesitation, shoot Mr. Gaut in the chest.

Phillip Stout is the firearms section supervisor for the North Louisiana Crime Lab, and the parties stipulated that he is an expert in the field of firearm identification. Mr. Stout tested the .22 caliber magnum revolver used by Parker and found it to be a functional firearm. He also tested the bullet recovered from Mr. Gaut's body and stated that it was the same bullet fired from the .22 caliber magnum revolver. Mr. Stout explained that the gun used by Parker is a single action revolver, meaning that it requires the user to cock the hammer before pulling the trigger. Mr. Stout then authenticated a crime lab report he created setting forth his conclusions as summarized above, which was then admitted.

Kristen McFarland is a member of Mr. Gaut's extended family and witnessed the shooting. She left the funeral procession early in order to help set up Ms. Smith's house for the repast. When she arrived at Ms. Smith's house, she saw Parker next door pulling items out of R.J.'s truck parked in his driveway. Ms. McFarland testified that Parker was using vulgar language, saying that he was mad because he couldn't go to the store and get alcohol due to R.J.'s truck blocking him in. Ms. McFarland witnessed Parker "cussing out" Mr. Gaut about the truck situation. She said that about five minutes after Mr. Gaut called to R.J. to come move the truck, R.J. appeared and moved the truck to a parking spot on the street.

Ms. McFarland then saw Parker harass R.J. in Ms. Smith's front yard before Mr. Gaut came outside to attempt to calm down Parker. She then saw Parker and Mr. Gaut exchange words before Mr. Gaut pushed Parker to the

7

ground. Ms. McFarland testified that Parker then got back up after being pushed down, pulled out a gun from his pocket, and shot Mr. Gaut. After shooting Mr. Gaut, Ms. McFarland testified that Parker started waving his gun around at everyone nearby before tapping Mr. Gaut on the forehead, saying "You dead." She then identified Parker in the courtroom.

Tai-jah Graham ("Tai-jah") is a member of Mr. Gaut's extended family and was in the car with R.J. when he got the call to move his truck. After R.J. moved his truck, Tai-jah saw Parker saying things to R.J. that appeared to upset him. Tai-jah then saw R.J. call out to his father for help, which caused Mr. Gaut to walk out to Ms. Smith's front yard to talk to Parker. She saw the two men exchange words before Mr. Gaut pushed Parker. Tai-jah then saw Parker get back up, pull out a gun, and shoot Mr. Gaut. She also saw Parker wave the gun around at everyone located nearby. After Parker went back into his house, Tai-jah called 911. She then identified Parker in the courtroom.

Tahj Graham ("Tahj") is also a member of Mr. Gaut's extended family who witnessed the shooting. Tahj was in the vehicle with R.J. when R.J. got the call to move his truck, and was in Ms. Smith's carport when the shooting occurred. After they arrived back at Ms. Smith's house, he saw R.J. move the truck. After Mr. Gaut came outside, Tahj testified that he saw Parker talking in an aggressive manner to Mr. Gaut. Tahj then saw Mr. Gaut push Parker, "because [Parker] was all the way in [Mr. Gaut's] face." Mr. Graham observed Parker get back up, pull a gun out of his right pants pocket, point it at Mr. Gaut, and shoot him from a distance of four or five feet. Tahj then identified Parker in the courtroom.

8

Ysidra Lee is another member of Mr. Gaut's extended family who witnessed the shooting. After R.J. moved his truck, she saw Parker come out of his house and start acting belligerent toward R.J. Ms. Lee then saw Mr. Gaut and Parker exchanging words in Ms. Smith's front yard. Ms. Lee testified that she saw Mr. Gaut push Parker because Parker was "right in his face." Ms. Lee said she then turned to say something to her mother and heard a loud gunshot. When she turned back around, she saw Mr. Gaut laying on the ground and Parker standing over him holding a gun still pointed at him. Ms. Lee said that after the shooting Parker did not appear remorseful or upset and acted "like he hadn't even done anything." After Parker went back into his house, Ms. Lee then approached Mr. Gaut and helped his wife perform CPR on him. Ms. Lee identified Parker in the courtroom.

Officer Maria Gardner ("Off. Gardner") is one of the patrol officers with SPD who responded to the crime scene. When she arrived at the scene, she found Mr. Gaut laying on the ground in front of Ms. Smith's house and helped render aid to him. Off. Gardner also collected the numerous witnesses to the shooting and brought them to the station to be interviewed by detectives.

Corporal Troy Mayweather ("Cpl. Mayweather") works in the patrol division of SPD and was one of the officers who arrested Parker after the shooting. Cpl. Mayweather testified that when he arrived at the scene, Mr. Gaut was laying in the front yard of Ms. Smith's house and Parker was located inside his house next door. After verbal commands were made, Parker exited his house and was taken into custody by Cpl. Mayweather and other SPD officers. Cpl. Mayweather then entered Parker's house to secure

the residence and found a .22 caliber magnum revolver on top of Parker's refrigerator. Cpl. Mayweather was shown the .22 caliber magnum revolver in court and confirmed that it was the same one he recovered from Parker's residence.

Katrina Wright is employed as a death investigator with the Caddo Parish Sheriff's Office. After the autopsy took place, she collected the bullet found in Mr. Gaut's body and transferred it to the North Louisiana Crime Lab. Ms. Wright was shown the bullet collected from Mr. Gaut's body and confirmed that it was the same one she sent to the crime lab.

Officer Montrel Jackson ("Off. Jackson") is a patrol officer with SPD and was one of the officers who responded to the crime scene on the day of the shooting. Off. Jackson helped in the arrest of Parker and noticed a strong odor of alcohol emanating from Parker in the process of arresting him. Off. Jackson also observed that Parker had slurred speech and that his eyes were glossy and bloodshot.

Larry Alexander was also a witness to the shooting. Mr. Alexander did not know Mr. Gaut or Parker prior to the incident. He gave his friend Michael Lee a ride to the funeral and came back to Ms. Smith's house after the funeral for the repast. He parked his vehicle across the street from Ms. Smith's house. Mr. Alexander witnessed the confrontation between Mr. Gaut and Parker and heard Mr. Gaut tell Parker to get out of his yard three times. Mr. Alexander saw Mr. Gaut push Parker to the ground. He then heard the gunshot, saw Mr. Gaut fall down and grab his chest. Mr. Alexander then observed Parker standing over Mr. Gaut while Parker had a gun in his hand. After the shooting, Mr. Alexander described the scene as "pandemonium." He then identified Parker in the courtroom.

Michael Lee was another member of Mr. Gaut's extended family and was in the carport of Ms. Lee's house at the time of the shooting. After the funeral he arrived at Ms. Smith's house with Mr. Alexander. He saw Mr. Gaut and Parker having an argument and then heard a gunshot.

The state rested. Parker elected to testify. Parker testified that at the time of the incident, he had lived at his house on East Washington Street for 14 years and had become friendly with his neighbor Ms. Smith during that time. Parker said that Ms. Smith would occasionally cook food for him and care for him when he was sick. Parker testified that on the day of the incident he was concerned that the truck parked in his driveway meant that he was soon to be the victim of a home invasion. He also said that he needed to go check on his mentally ill brother, and could not do so because he was blocked in. When asked whether or not he gave consent for Ms. Smith's family to park a car in his driveway on the day of the funeral, Parker said, "not that I recall."

Due to his concerns, Parker claimed he went outside with a cocked gun in one hand and a knife in the other. He claimed that R.J. was "rapping a song" in his direction using expletives, but that he did not say anything to R.J. Parker claimed that R.J.'s father, Mr. Gaut, then motioned for him to come over to Ms. Smith's yard, which he did. Parker said that Mr. Gaut then poked him in the chest and pushed him to the ground. He claimed that as soon as he hit the ground his gun went off, which is how Mr. Gaut was shot. Parker claimed that he then got up and went to check Mr. Gaut's pulse before returning to his house to call 911. Regarding the 911 call, Parker confirmed that he told the 911 operator he "only shot [Mr. Gaut] one time,"

11

and that he never told the 911 operator that the shooting was unintentional. The defense rested.

The trial court found Parker guilty of second degree murder. The trial court then denied Parker's motion for a new trial and sentenced Parker to life imprisonment without benefits. No motion to reconsider sentence or motion for appeal was filed by Parker's counsel.

On September 3, 2021, Parker's counsel filed a motion to withdraw, which the trial court granted on September 15, 2021. Parker then filed a pro se application for post-conviction relief, seeking an out-of-time appeal. The trial court granted Parker's request on February 7, 2022, and this appeal ensued.

## DISCUSSION

Defendant's first assignment of error is that the evidence is insufficient to support his conviction for second degree murder. Defendant contends that, at best, the evidence proves manslaughter during an act of negligent homicide or under sudden heat of passion.

The state argues that it established beyond a reasonable doubt that Parker possessed the requisite specific intent to kill or to inflict great bodily harm when he shot and killed Mr. Gaut in front of multiple witnesses. The state notes that the trial court was presented with both the state's and Parker's version of the events leading up to Mr. Gaut's death and weighed the credibility of each witness in turn. And, by finding Parker guilty as charged of second degree murder, the state argues that the trial court rejected Parker's contention that the revolver used to kill Mr. Gaut accidentally misfired when he fell to the ground. The state argues that the evidence presented at trial supports Parker's conviction, and that his assertion on

12

appeal that he should have been convicted of a lesser included verdict is without merit.

When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Hearold*, 603 So. 2d 731 (La. 1992). The Louisiana Supreme Court has set forth the following standard of review of the sufficiency of the evidence:

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Neal*, 00-0674, (La. 6/29/01) 796 So. 2d 649, 657 (citing *State v. Captville*, 448 So. 2d 676, 678 (La. 1984)).

*State v. Brown*, 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.

Relevant to this case, second degree murder is "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries. *State v. Bull*, 53,470 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1175, *writ denied*, 20-00797 (La. 12/22/20), 307 So. 3d 1040.

La. R.S. 14:31(A)(1) states that manslaughter is:

> A homicide which would be murder under ... Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

A defendant who claims provocation as a means of reducing murder to manslaughter bears the burden of proving these elements by a preponderance of the evidence. *State v. McGee*, 51,977 (La. App. 2 Cir. 4/3/19), 316 So. 3d 1196, *writ denied*, 19-00761 (La. 11/19/19), 282 So. 3d 1066. Provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *Id*., *citing State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d. 100 (2007).

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d. 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. *Id*. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to a fact-finder's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422.

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the

state proved the essential elements of second degree murder. The state presented sufficient evidence to prove that Parker killed Mr. Gaut when he had a specific intent to kill or to inflict great bodily harm. The testimony from numerous witnesses established that Parker was upset at his neighbors about his car being blocked in and went next door with a weapon. After Parker was pushed, every eyewitness testified that Parker then drew his gun and fired it into Mr. Gaut's chest. This was sufficient to show Parker's intent. See *State v. Lewis*, 08-1317 (La. App. 5 Cir. 5/26/09), 16 So. 3d 390 (holding that specific intent to kill may be inferred from the act of pointing a gun and firing at a person from close range). Parker's claim that his gun went off accidentally when he hit the ground after being pushed is contradicted by Parker's own statements in his 911 call and is simply not supported by the evidence.

Defendant's argument that he should have been convicted of the lesser offense of either negligent homicide or manslaughter is without merit. Defendant did not meet his burden of proving that he committed the homicide in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. While Mr. Gaut did push Parker to the ground, that act, under these facts, is not sufficient justification for the shooting, nor did it create a sudden passion or heat of blood situation that would warrant a finding of manslaughter, particularly since it was Parker who instigated the confrontation. Accordingly, this assignment of error lacks merit.

For his second assignment of error, Parker argues that his life sentence, although statutorily mandated, is excessive. He argues that because he is a sixty-eight-year-old disabled Vietnam war veteran with no

prior criminal history, the mandatory life sentence should not have applied to him, especially considering that the tragic incident which resulted in Mr. Gaut's death was not intentional. Alternatively, defendant argues that it was ineffective assistance of counsel for his lawyer to withdraw without objecting to the sentence and before filing both a motion to reconsider the sentence and a motion for appeal.

The state contends that the circumstances do not warrant a downward departure from the mandatory sentence of life imprisonment and that the evidence at trial proved beyond a reasonable doubt that Parker intended to kill or inflict great bodily harm upon Mr. Gaut when he shot him in the chest. Regarding defendant's ineffective assistance of counsel claim, the state argues that defendant is unable to prove that his trial counsel's performance was deficient at sentencing and that he was prejudiced by trial counsel's inadequate performance as a result.

Where no motion to reconsider sentence is filed, the defendant is relegated to a claim of constitutional excessiveness. *State v. Nabors*, 53,357 (La. App. 2 Cir. 4/22/20), 295 So. 3d 974, *writ denied*, 20-00709 (La. 10/6/20), 302 So. 3d 527. A sentence violates La. Const. Art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. Jackson*, 52,606 (La. App. 2 Cir. 4/10/19), 268 So. 3d 1217, *writ*

16

*denied*, 19-00699 (La. 10/15/19), 280 So. 3d 560, and *writ denied*, 19-00797 (La. 1/28/20), 291 So. 3d 1056.

Where there is a mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. *State v. Burd*, 40,480 (La. App. 2 Cir. 1/27/06), 921 So. 2d 219, *writ denied*, 06-1083 (La. 11/9/06), 941 So. 2d 35.

The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. La. R.S. 14:30.1(B). The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. *State v. Parker*, 416 So. 2d 545 (La. 1982); *State v. Roberson*, 40,809 (La. App. 2 Cir. 4/19/06), 929 So. 2d 789.

To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that he is exceptional, namely, that, because of unusual circumstances, the defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So. 2d 672; *State v. Parker*, 47,952 (La. App. 2 Cir. 4/10/13), 113 So. 3d 471, *writ denied*, 13-1051 (La.11/15/13), 125 So. 3d 1101.

The mandatory sentence of life imprisonment for a conviction of second degree murder is presumed to be constitutional, and Parker failed to demonstrate that he is an "exceptional" defendant for whom a downward departure from the statutory minimum sentence is required. Defendant's age and status as a Vietnam war veteran with no criminal record are inadequate

to show that the sentence is inappropriate for him. Moreover, when compared to the severity of the offense, defendant's sentence is neither grossly disproportionate nor shocking to the sense of justice. We find, therefore, that defendant's life sentence is not constitutionally excessive.

We next address Parker's alternate argument of ineffective assistance of counsel due to his lawyer's decision to withdraw before filing a motion to reconsider sentence. As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief in the trial court than by appeal. This is because post-conviction relief creates the opportunity for a full evidentiary hearing. However, when the record is sufficient, an appellate court may resolve this issue on direct appeal in the interest of judicial economy. *State v. Nixon*, 51,319 (La. App. 2 Cir. 5/19/17), 222 So. 3d 123, *writ denied*, 17-0966 (La. 4/27/18), 239 So. 3d 836.

The mere failure to file a motion to reconsider sentence does not in and of itself constitute ineffective assistance of counsel. A basis for ineffective assistance of counsel may only be found if a defendant can show a reasonable probability that, but for counsel's error, his sentence would have been different. *State v. Jones*, 46,712 (La. App. 2 Cir. 11/02/11), 80 So. 3d 500, *writ denied*, 12-0016 (La. 08/22/12), 97 So. 3d 356; *State v. Louis*, 32,347 (La. App. 2 Cir. 10/27/99), 744 So. 2d 694. Parker's sentence, life imprisonment without the benefit of parole, probation, or suspension of sentence, was the mandatory penalty for the crime he was convicted of. Parker failed to allege how his age and lack of prior criminal record at the time of the offense justified a deviation from the mandatory sentence. He likewise did not allege any special circumstances that would support a

deviation from the mandatory sentence provided in La. R.S. 14:30.1. Parker failed to show that he is exceptional or that the mandatory life sentence is not meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. See *State v. Collins*, 09-1617 (La. App. 1 Cir. 02/12/10), 35 So. 3d 1103, *writ denied*, 10-0606 (La. 10/08/10), 46 So. 3d 1265.

Because Parker failed to prove that a motion to reconsider the sentence would have resulted in a different sentence, we cannot find that the failure of his trial counsel to file a motion to reconsider sentence constitutes ineffective assistance of counsel. *State v. Brooks*, 52,334 (La. App. 2 Cir. 11/14/18), 260 So. 3d 713, *writ denied*, 18-2031 (La. 4/15/19), 267 So. 3d 1121; *State v. Lee*, 26,542 (La. App. 2 Cir. 05/12/94), 636 So. 2d 634. Accordingly, this assignment of error is also without merit.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of defendant Ronald Berry Parker are affirmed.

**AFFIRMED.**

19